Jay M. Sakalo
  Florida Bar No. 156310 (*pro hac* admission pending)
  jsakalo@bilzin.com
**BILZIN SUMBERG BAENA**
**PRICE & AXELROD LLP**
1450 Brickell Avenue, Suite 2300
Miami, Florida 33131
(305) 374-7580 (*telephone*)
(305) 374-7593 (*facsimile*)

Melissa S. Hayward
  Texas Bar No. 24044908
  MHayward@HaywardFirm.com
**HAYWARD & ASSOCIATES PLLC**
10501 North Central Expy., Suite 106
Dallas, Texas 75231
(972) 755-7100 (*telephone*)
(972) 755-7110 (*facsimile*)

**COUNSEL FOR RIALTO REAL ESTATE FUND IV – PROPERTY LP**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | |
|---|---|
| In re: | |
| **TUESDAY MORNING CORPORATION,** **et al.,** | **Case No. 20-31476-HDH-11** **Chapter 11** **(Jointly Administered)** |
| Debtors.[1] | |

## OBJECTION OF RIALTO REAL ESTATE FUND IV - PROPERTY LP TO REVISED SECOND AMENDED JOINT PLAN OF REORGANIZATION OF TUESDAY MORNING CORPORATION, *ET AL.* PURSUANT TO CHAPTER 11 OF THE BANKRUPTCY CODE

---

[1] The Debtors in these Chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, include: Tuesday Morning Corporation (8532); TMI Holdings, Inc. (6658); Tuesday Morning, Inc. (2994); Friday Morning, LLC (3440); Days of the Week, Inc. (4231); Nights of the Week, Inc. (7141); and Tuesday Morning Partners, Ltd. (4232). The location of the Debtors' service address is 6250 LBJ Freeway, Dallas, TX 75240.

Rialto Real Estate Fund IV - Property LP ("Rialto"), by and through undersigned counsel, objects to the Revised Second Amended Joint Plan of Reorganization of Tuesday Morning Corporation, *et al.*, Pursuant to Chapter 11 of the Bankruptcy Code [ECF No. 1633] (the "Plan").[2]

## INTRODUCTION

The chapter 11 process must be transparent at every level and neither a debtor nor any official committee appointed in a case should be permitted to take any actions that call into question the sanctity of the chapter 11 process. See 11 U.S.C. §1129(a)(3). Unfortunately, here, the Debtors' actions (apparently with the blessing of the Official Committee of Unsecured Creditors and the Official Committee of Equity Security Holders) related to the proposed sale of their Texas-based real estate have neither been transparent nor upheld the sanctity of the chapter 11 process.

As this Court is well aware, the Debtors faced a fork in the road in September and October 2020 in these cases. They had to decide whether to pursue a sale of their assets under section 363 or to pursue a plan of reorganization. The Debtors went so far as to have a 363 bidding procedures order entered in these cases [ECF No. 1090] for the "potential" sale of their assets. But, at the same time, the Debtors were determining if they could put together a confirmable plan of reorganization. As to the latter, a key component would be the sale of the owned real estate. On October 26, 2020, the Debtors chose the plan of reorganization path and explicitly elected not to pursue a 363 sale of their assets pursuant to an auction process. [ECF No. 1436].

After electing to pursue the plan route, the Debtors locked up the three critical economic components of the Plan -- (1) the $60 million sale of the Debtors' owned property in Dallas, Texas

---

[2] Capitalized terms used but not otherwise defined herein shall have the meaning ascribed to them in the Plan.

to Rialto, accompanied with a market-based leaseback for the industrial and office buildings, (2) an exit loan from a third-party lender, and (3) an equity rights offering. Under the Plan, Rialto was selected to be the Sale Leaseback Counterparty (the purchaser of the owned real estate) pursuant to an extensive and arduous marketing plan. The Plan, as filed on November 18, 2020, provides for a 100% payout to creditors and the reinstatement of equity in the reorganized Debtors.

Nevertheless, (a) six weeks after agreeing to the sale to Rialto, (b) five weeks after filing an 8-K with the Securities and Exchange Commission identifying Rialto as the purchaser of the owned real estate, and (c) four weeks after obtaining approval of the Disclosure Statement from this Court, the Debtors filed their Plan Supplement blithely stating they received a **<u>new</u>** "bid" to purchase the owned real estate and, therefore, were jettisoning their deal with Rialto to move forward with the new bidder.

What the Debtors failed to tell the Court is that the "new" bid was not from a stranger to the process, but rather the loser in the Debtors' initial process -- an entity owned and controlled by Pennybacker Capital. Before the Debtors selected Rialto to be the purchaser of the owned real estate, Rialto went through numerous rounds of bidding against an unidentified bidder (which Rialto has confirmed was Pennybacker Capital), which included calls from CBRE, the Debtors' real estate advisor, for BEST AND FINAL bids. In fact, just prior to being selected as the winning bidder, Rialto was presented with a form purchase and sale agreement against which it was to submit its BEST AND FINAL offer.

Rialto did so. So did Pennybacker Capital. Rialto bid $60 million, posted a $4.5 million deposit and was selected as the winning bidder, presumably because Pennybacker Capital bid less than Rialto's bid. There was a process conducted by the Debtors, which Rialto won and Pennybacker Capital lost. Imagine Rialto's surprise when six weeks after signing its purchase and

sale agreement with the Debtors, the Plan Supplement revealed that the "new bid" came from Pennybacker Capital -- the exact same bidder that previously presented its best and final bid six weeks earlier, and lost.

The Debtors rely upon their purported "fiduciary duties" to justify switching horses and throwing Rialto to the side. However, again, the Debtors are not being transparent with the Court. The Debtors fail to remind the Court that the Equity Committee requested and was permitted to include a letter supporting the Plan, with Rialto's $60 million purchase price for the owned real estate. Moreover, the Creditors' Committee also supported the Plan with Rialto as the purchaser. The public securities market was informed that the agreement with Rialto was moving forward. The Debtors failed to include any statements in their publicly filed documents -- whether with this Court or with the SEC -- that they intended to consider or entertain further bids for the Owned Real Estate.

Indeed, as shown below, the Disclosure Statement makes clear that their chosen process was broad and wide, and the negotiations were "extensive", to wit:

> The Debtors, with the help of Miller Buckfire, solicited interest from more than 92 prospective lenders regarding the possibility of providing a post Effective Date secured loan facility secured by the Debtors' owned real property. The Debtors also retained CBRE to assist them in exploring a possible sale or sale leaseback of the Debtors' owned real property. **CBRE solicited interest from more than 10 prospective purchasers regarding the possibility of entering into a sale leaseback of the Debtors' owned real property. Based on the responses received through the processes conducted by Miller Buckfire and CBRE, the Debtors determined that it would be in the best interests of the Debtors and their estates to pursue a sale leaseback transaction instead of obtaining a secured credit facility secured by the Debtors' owned real property**.

> **The Debtors, with the help of CBRE, engaged in extensive negotiations with several interested sale leaseback counterparties and ultimately decided to enter into the Sale Leaseback transactions with Rialto Real Estate Fund IV – Property LP, the Sale Leaseback Counterparty. The Through the Sale Leaseback, the Debtors will sell their owned real property to the Sale Leaseback Counterparty for $60 million**. Concurrently with the

consummation of the sale, the Reorganized Debtors will enter into lease agreements under which certain of the Reorganized Debtors will lease the headquarters and warehouse facilities from the Sale Leaseback Counterparty. The lease of the headquarters facility will be for a term of 10 years and the lease of the warehouse facilities will be for an initial term of 2.5 years with an option to extend the warehouse facilities lease for one additional year. The Sale Leaseback Documents will be included in the Plan Supplement and the Sale Leaseback will be approved as part of the Plan and will be consummated on or near the Effective Date.

ECF No. 1634, p. 49 of 316 (emphasis added).

Under the Plan, all creditors will be paid in full. But, now the Debtors' attempt to push for a do-over is a windfall to equity at the expense of the process. For the reasons set forth below, the Court should deny confirmation of the Plan to the extent the Debtors seek to move forward with a purchaser other than Rialto with respect to the owned real estate.

## BACKGROUND

1.    On May 27, 2020, the Debtors filed voluntary petitions for relief in this Court.

2.    Both prior to and throughout the chapter 11 cases, the Debtors engaged in extensive marketing processes to solicit restructuring alternatives, offers to purchase the Debtors' assets or otherwise provide financial support for the Debtors' exit from chapter 11. See generally, ECF No. 1634, pp. 32, 47-49.

3.    The Debtors determined that the filing of a plan of reorganization and disclosure statement, while at the same time conducting an open marketing and sale process would be the best way to maximize value for the Debtors and their estates. See ECF No. 1634, p. 48. The Debtors did so because the "concurrent prosecution of a plan and a court-approved process for

bidding and potential sale of substantially all of their assets [would] allow the Debtors to assess the relative benefits of a plan of reorganization or a sale." Id.

4.      Thus, on September 23, 2020, the Debtors filed their initial plan and disclosure statement and also filed *Debtors' Expedited Motion Pursuant to Bankruptcy Code §§ 105(a), 363, and 365, and Bankruptcy Rules 2002, 6004, and 6006, for Entry of an Order (A) Approving Sale and Bidding Procedures in Connection with a Potential Sale of Assets of the Debtors, (B) Authorizing the Sale of Assets Free and Clear of All Liens, Claims, Encumbrances, and Other Interests, and (C) Granting Related Relief* [ECF No. 948] (the "Bidding Procedures Motion").

5.      The Creditors Committee and certain landlords objected to the Bidding Procedures Motion.  Over those objections, the Court entered an order approving the Bidding Procedures Motion (the "Bidding Procedures Order") [ECF No. 1090].  Critically, the Bidding Procedures Order set deadlines for (a) qualified bidders to submit bids to acquire some or all of the Debtors' assets and (b) the Debtors to announce whether they intended to pursue a sale of their assets or to pursue confirmation of a plan.

6.      In furtherance of the dual-track process, the Debtors and their numerous advisors, including Miller Buckfire and CBRE, continued their very active and aggressive marketing processes.  Nevertheless, according to the Debtors, no binding purchase offers were presented that would have resulted in full payment to holders of General Unsecured Claims.  See ECF No. 1634, p. 49.  The only committed offer would have resulted in an approximate 70% payout to holders of General Unsecured Claims.  Id.

7.      At the same time, the Debtors continued to pursue the plan process. That process included the marketing of the Debtors' Owned Real Property for a sale leaseback.   In response to contact from CBRE, on August 29, 2020, Rialto initially offered $40 million for the purchase of

the industrial portfolio only. Thereafter, after further requests from CBRE to fold the office headquarters into the offer, on September 11, 2020, Rialto increased its offer to $43 million for all of the Owned Real Property. That revised offer indicated a specific request for stalking horse protections if the bid was going to be in conjunction with a 363 sale process.

8.     From there, the Debtors embarked on an unorthodox process of soliciting "closed" bids for the plan of reorganization. CBRE, expressly on behalf of the Debtors' estates, made repeated requests to Rialto to increase its bid.

9.     On September 23, 2020, CBRE sent a notice to Rialto asking for a "BEST AND FINAL" bid. Rialto complied with CBRE's demand and increased its bid to $53 million.

10.     On October 7, 2020, after it increased its bid to $53 million, Rialto was informed by the Debtors' management and CBRE that it was awarded the bid under the plan process (and not the 363 auction process) and was supplied the next day with a draft purchase and sale agreement and lease agreement by the Debtors' counsel. In express reliance on the Debtors' statements, Rialto immediately began negotiating the terms of those agreements with the Debtors' counsel and engaged third party professionals to complete its due diligence.

11.     However, despite the Debtors informing Rialto that they were moving forward with them as the purchaser under the Plan and despite Rialto's good faith negotiations over the purchase agreement and lease, on October 12, 2020, the Debtors, through CBRE, informed Rialto they "were going in another direction," but without any detailed explanation.

12.     Despite these statements by CBRE, by mid-October 2020, the Debtors still had not publicly announced whether they were pursuing the sale route under the Bidding Procedures Order or the plan of reorganization, despite that deadlines were quickly approaching under the Bidding Procedures Order. Thus, in accordance with the Bidding Procedures Order, on October 19, 2020,

Rialto submitted a $53.5 million Qualified Bid (as defined in such Bidding Procedures Order) to purchase the Owned Real Estate and also indicated to the Debtors and the Consultation Parties (as defined in such Bidding Procedures Order) its continued willingness to purchase the Owned Real Estate under the plan reorganization process.  In order to provide the Debtors and their estates with even more certainty, Rialto's Qualified Bid made it clear that it would offer the same sale/leaseback terms to any successful purchaser of the Debtors' operating assets if such purchaser was interested in continuing to occupy the premises.

13.    While waiting to receive a formal response from the Debtors, the Debtors' professionals indicated that the "other bidder" [i.e., Pennybacker Capital] was higher than Rialto's offer.  Thus, in reliance on CBRE's statements, on October 23, 2020, Rialto increased its bid to $57 million:

---

**From:** Aaron Davis <aaron.davis@rialtocapital.com>
**Sent:** Friday, October 23, 2020 10:27 AM
**To:** Vogds, Timothy @ Dallas <Timothy.Vogds@cbre.com>; Fraker, Jack @ Dallas <Jack.Fraker@cbre.com>
**Cc:** Brady Scott <brady.scott@rialtocapital.com>; Mike Parker <mike.parker@rialtocapital.com>; Jay Mantz <jay.mantz@rialtocapital.com>
**Subject:** Tuesday Morning: Revised Rialto Bid

`External`

Tim/Jack: See below and attached reflecting our increased offer for the sale-leaseback on both the reorg and 363.

Price = $57,000,000 (increase of $3,500,000).

We remaining non-refundable with $4,500,000.

We're available to discuss at your convenience.

-Aaron

**Aaron Davis**
Managing Director

Rialto Capital Management
1170 Peachtree Street NE, Suite 650
Atlanta, GA 30309
aaron.davis@rialtocapital.com
www.rialtocapital.com

---

14.    That indication of continued interest woke up the Debtors and the Consultation Parties as they contacted Rialto to determine if an even further increased bid could be made. And,

again, CBRE called for "BEST AND FINAL" bids to made against the proposed final form of purchase agreement and leaseback documents that Pennybacker Capital had agreed to:

**From:** Vogds, Timothy @ Dallas <Timothy.Vogds@cbre.com>
**Sent:** Sunday, October 25, 2020 7:12 PM
**To:** Aaron Davis <aaron.davis@rialtocapital.com>; Fraker, Jack @ Dallas <Jack.Fraker@cbre.com>
**Cc:** Brady Scott <brady.scott@rialtocapital.com>; Mike Parker <mike.parker@rialtocapital.com>; Jay Mantz <jay.mantz@rialtocapital.com>; Peck, Ian T. <Ian.Peck@haynesboone.com>; Konopka, Christopher <Chris.Konopka@haynesboone.com>; Bryant, Brack <Brack.Bryant@haynesboone.com>
**Subject:** RE: Tuesday Morning: Revised Rialto Bid

Thank you Aaron.  Please submit your BEST AND FINAL offer based on the attached PSA and Leaseback agreements as soon as possible!  Thank you!

Tim Vogds, SIOR | Senior Vice President
CBRE | Occupier Advisory Services
2100 McKinney Avenue, Suite 700 | Dallas, TX 75201
T +1 214 979 6356 | F +1 214 979 6390 | C +1 214 289 8309
tim.vogds@cbre.com | www.cbre.com/tim.vogds

Connect with me on LinkedIn

Follow CBRE: Facebook | @cbre | Google+

15.     Rialto was provided with a form purchase and sale agreement by CBRE and was informed that the process was to review the best and final bids against that form of agreement based on price.

16.     On October 26, 2020, the Debtors filed their *Notice of Intention to Pursue Plan Confirmation and Notice of Rescheduled Hearing Date to Consider Approval of the Debtors' Disclosure Statement and Related Deadlines* [ECF No. 1436] (the "Pivot Notice").  Importantly,

the Pivot Notice made clear that the Debtors made the informed, express decision to pursue a plan of reorganization instead of a sale of their assets pursuant to an auction process.

17.     Thereafter, on October 27, 2020, CBRE again contacted Rialto to demand that the BEST AND FINAL bid be submitted by the end of the business day:

> **From:** Vogds, Timothy @ Dallas <Timothy.Vogds@cbre.com>
> **Sent:** Tuesday, October 27, 2020 3:56 PM
> **To:** Ryan Meehan <ryan.meehan@rialtocapital.com>; Alison Hersey <alison@piburncompany.com>
> **Cc:** Brady Scott <brady.scott@rialtocapital.com>; Mike Parker <mike.parker@rialtocapital.com>; Aaron Davis
> <aaron.davis@rialtocapital.com>; Fraker, Jack @ Dallas <Jack.Fraker@cbre.com>; Thornton, Ryan @ Dallas
> <Ryan.Thornton@cbre.com>
> **Subject:** RE: Tues Morning Dallas - Survey Updates
>
> Rialto team.  We will need your BEST AND FINAL offer by end of business today please.   Thank you!
>
> Tim Vogds, SIOR
> CBRE | Occupier Advisory Services
> T +1 214 979 6356 | C +1 214 289 8309
> tim.vogds@cbre.com | www.cbre.com/tim.vogds
>
> Connect with me on LinkedIn

18.     In response to CBRE's demand for BEST AND FINAL bids, Rialto submitted a $60 million bid for all of the Owned Real Property.

> **From:** Aaron Davis <aaron.davis@rialtocapital.com>
> **Sent:** Tuesday, October 27, 2020 3:03 PM
> **To:** Vogds, Timothy @ Dallas <Timothy.Vogds@cbre.com>; Fraker, Jack @ Dallas <Jack.Fraker@cbre.com>
> **Cc:** Brady Scott <brady.scott@rialtocapital.com>; Mike Parker <mike.parker@rialtocapital.com>; Jay Mantz
> <jay.mantz@rialtocapital.com>; Peck, Ian T. <Ian.Peck@haynesboone.com>; Konopka, Christopher
> <Chris.Konopka@haynesboone.com>; Bryant, Brack <Brack.Bryant@haynesboone.com>; Jay M. Sakalo (jsakalo@bilzin.com)
> <jsakalo@bilzin.com>; Myles R. Burstein <mburstein@bilzin.com>; 'L. Kent Koch' <KKoch@bilzin.com>; James Doak
> (james.doak@millerbuckfire.com) <james.doak@millerbuckfire.com>
> **Subject:** RE: Tuesday Morning: Revised Rialto Bid
>
> External
>
> Attached are revisions to the PSA and leases. The PSA reflects a revised purchase price of $60,000,000 along with a $4,500,000 non-refundable deposit.
>
> Please let us know next steps as soon as possible.
>
> Regards, Aaron
>
> **Aaron Davis**
> Managing Director

19.     Shortly after submitting that offer, Rialto was informed by the Debtors that it was again selected as the winning purchaser (over Pennybacker Capital), and fully executed purchase agreement and leaseback documents were delivered by the Debtors to Rialto:



20.     As a result, as is entirely customary in the real estate industry, Rialto immediately commenced negotiations with third party lenders to finance the acquisition of the Owned Real Estate.

21.     The Debtors then filed their amended plan and disclosure statement in advance of the disclosure statement hearing on November 16, 2020 (the "Disclosure Statement Hearing").

22.     On November 5, 2020, Tuesday Morning Corporation filed a Form 8-K with the SEC disclosing the entry into the Sale Leaseback Facility with Rialto.     See https://ir.tuesdaymorning.com/static-files/a8b525eb-3095-4ede-9aca-cc0cc125638b.     The 8-K disclosed the economic and non-economic terms of the Sale Leaseback Facility and attached the

executed agreements with Rialto. The 8-K did not state or suggest that the closing on the Sale Leaseback Facility was subject to other bids or offers.[3]

23. On November 16, 2020, at the Disclosure Statement Hearing, the Debtors announced that they had put together a plan that would provide a **100% payout to holders of General Unsecured Claims** that included a sale of the Owned Real Estate to Rialto pursuant to the Sale Leaseback Facility. The Debtors did not disclose to or otherwise notify the Court or the public that the sale of the Owned Real Estate would be (or could be) subject to additional bids/offers.

24. On November 30, 2020, Rialto was contacted by CBRE for the first time since the execution of the agreements on October 30, 2020. CBRE informed Rialto that it received another "bid" for the Owned Real Estate but would not disclose who the bidder was or the proposed purchase price and called yet again for "BEST AND FINAL" bids. Rialto immediately objected to the Debtors' counsel and counsel to the Equity Committee that there was no basis under the Plan to re-open bidding and the process was closed as of October 30, 2020 and the approval of the

---

[3] Indeed, the Debtors knew how to include a fiduciary "out" when they wished to, such as the express fiduciary out included in the equity rights offering backstop agreement. See ECF No. 1578, Ex 5., p. 288-289. Here, however, the purchase agreement with Rialto did not include any such fiduciary out, again confirming the Debtors' intention to proceed with Rialto from and after October 30, 2020.

Disclosure Statement, but both counsel argued that they had a fiduciary duty to consider higher bids.[4] As a result, on December 3, 2020, the Debtors sent the following email:



25. After discussions between undersigned counsel and the Debtors' counsel, Rialto was provided with the amount of the increased proposed purchase price -- $63.25 million -- but not the name of the bidder. Thereafter, Rialto, while reserving all of its rights and remedies against the Debtors and others, submitted an increased bid for $65 million on December 3, 2020.

---

[4] Interestingly, during discussions with the Equity Committee's counsel, it became very apparent that the Debtors were not keeping the Equity Committee fully informed about the numerous "BEST AND FINAL" bids made prior to October 30, 2020, raising yet another concern about the transparency of how the Debtors conducted themselves.

Pennybacker Capital, the party who previously lost in the Debtors' process, submitted a further increased bid of $70.25 million.

26. Then, on December 11, 2020, the Debtors filed their Plan Supplement, whereby they disclosed for the first time publicly that they intended to move forward with the Pennybacker Capital bid and not the Rialto bid, allegedly based on their perceived "fiduciary duties".

## ARGUMENT

### The Debtors Chose a Closed Bidding Process

27. As explained above, the Debtors had the explicit option of conducting a 363 auction process for their assets or to pursue a plan of reorganization. The Debtors obtained approval from this Court, by the Bidding Procedures Order, to solicit and consider Qualified Bids for their assets. Similarly, by virtue of their exclusive right to file a plan of reorganization and solicit acceptances thereof, the Debtors had the right to conduct the plan reorganization how they saw fit within the confines of the Bankruptcy Code and applicable law.

28. The Debtors elected to run a process that entailed numerous rounds of closed bidding between two ultimate bidders -- Rialto and Pennybacker Capital. By their process, which including the blessing of the Committees, the Debtors selected Rialto as the winning purchaser to form the bedrock of their 100% payout plan.

29. Weeks after the Plan was filed and Rialto's deal with the Debtors was made public, Pennybacker Capital made a "new" bid to the Debtors. Pennybacker Capital is neither a "new bidder" nor a stranger to the process by any stretch of the imagination. Pennybacker Capital had the exact same opportunities that Rialto had prior to October 30, 2020 to participate in the Debtors' process to maximize value for the Owned Real Estate. For whatever reason, Pennybacker Captial

chose not to top Rialto's bid. That was its choice in the processes developed and ran by the Debtors with the explicit approval of the Creditors Committee and the Equity Committee.

30.     Now, in a clear "wait and see" approach, Pennybacker Capital made a new offer to the Debtors in a process that has been closed for over six weeks.[5] Pennybacker Capital should not be permitted to come through the back door into a process they were clearly invited into, and participated in, through the front door.

### The Integrity of the Judicial System Requires Denial of Pennybacker's Additional Bid

31.     There is no question that one of the goals of a chapter 11 process is to maximize the recoveries by creditors. That goal was achieved with Rialto's bid that was accepted. However, while doing so, as Judge Bohm stated previously in facts very similar to those before this Court, the "[c]ourt must always keep one eye cocked on promoting and preserving the integrity of the judicial process." See In re Bigler, LP, 433 B.R. 101, 115 (Bankr. S.D. Tex. 2010).

32.     The facts of the Bigler case are particularly instructive and similar to the case at bar. There, the debtor chose to run a sale process for the sale of approximately 180 acres of real estate in Texas. After numerous parties raised objections, the court entered a bidding procedures order. The court found that the parties were represented by sophisticated counsel and that numerous parties signed off on the form of bidding procedures order. Id. at 101.

33.     After entry of the bidding procedures order, the debtors conducted an auction and, at the conclusion of the auction, selected a winning bidder. The winning bidder outbid a second

---

[5] As of the filing of this Objection, the extent and nature of the communications between the Debtors' representatives, including CBRE, and Pennybacker Capital are unknown. For example, it is unclear whether the Debtors were advising Pnnybacker Capital throughout the October 2020 timeframe that it was subject to the same "BEST AND FINAL" requirements as Rialto. It is also unclear whether the Debtors informed Pennybacker Capital that they would entertain additional bids after October 30, 2020 and whether the Debtors solicited (actively or passively) Pennybacker Capital after October 30, 2020. In any event, the Debtors did not disclose such actions to Rialto prior to executing the agreements.

bidder -- Vopak, who was represented by the same law firm as the Debtors in the case. Vopak chose voluntarily not to increase its bid at the end of the auction. Id. at 103-105. In fact, at the end of the auction, the debtor's counsel asked for "any other final bid" before calling a conclusion to the auction, and none was received. Id. at 105. Thereafter, the notice of the auction results and of a subsequent hearing to approve the auction results were made public by court filing. Id. There was no "indication anywhere in the [n]otice that any additional offers could thereafter be submitted in an effort to persuade the [d]ebtors to reject the . . . offer". Id. Importantly, the court did not think there could by any such indication "as neither the Bid Procedures nor the Bid Procedures Order contemplated such action." Id.

34. Subsequently, just prior to the sale approval hearing, Vopak -- the second place bidder at the auction -- re-appeared and submitted a new offer to the debtor. Id. at 106. At the sale hearing, all parties other than the winning bidder at the auction requested that the court re-open the bidding to allow Vopak's bid, but the court denied it. Id. at 107.

35. The court found that a sale "based on clear procedures may not be reopened solely for the reason of a higher bid after the close of the auction." Id. at 112.

36. The court's conclusion in Bigler should be adopted here.

37. First, the Debtors had two options -- sell their assets under a 363 sale or pursue a plan. They tested the waters to see if a 363 sale would generate sufficient proceeds. They concluded it would not. At the same time, they pursued a direct sale under the plan, but marketed the Owned Real Estate in a bidding contest between two bidders to find the highest price before bringing the Plan before the Court and seeking approval of the Disclosure Statement.

38. Second, the two bidders -- Rialto and Pennybacker Capital -- both had multiple opportunities prior to October 30, 2020 to submit BEST AND FINAL bids. Rialto's was better.

The Debtors, after discussions with the Consultation Parties, selected Rialto to move forward with the Plan.  Neither the Plan, the purchase agreement, the 8-K filed with the SEC nor any public statement suggested that the Rialto deal was subject to higher or better bids.  That, of course, is not surprising given that the Plan provides for a 100% recovery to holders of General Unsecured Claims.

39.     Here, to allow Pennybacker Capital -- the losing bidder in the Debtors' marketing process -- to game the system six weeks after the process closed is inequitable and improper.  As the Bigler court held, "reneging on clearly established and properly conducted procedures in order to generate some additional dollars for the estate undermines the integrity of the judicial process; indeed, it can undermine the integrity and reputations of the individual litigants and lawyers."  Id. The Debtors' efforts to rely on its "fiduciary duties" in pursuing a deal with Pennybacker Capital at this late stage rings hollow, as Pennybacker Capital was an interested party in the bidding process the entire time.  The integrity of the process requires that the Court deny confirmation of a Plan that seeks to sell the Owned Real Estate to Pennybacker Capital. Id.; see also In re Gil-Bern Indus., Inc., 526 F.2d 627, 628-629 (1st. Cir. 1975).

## CONCLUSION

40.     For the foregoing reasons, the Court should deny confirmation of the Plan to the extent that the Debtors seek to proceed with the Pennybacker Capital bid.  Rialto remains ready, willing and able to close on its purchase agreement with the Debtors dated as of October 30, 2020.

WHEREFORE, Rialto requests that this Court (a) deny the Plan and (b) grant Rialto such other and further relief as is appropriate.

Dated: December 16, 2020

Respectfully submitted,

/s/ Jay M. Sakalo
　Jay M. Sakalo
　Florida Bar No. 156310 (*pro hac admission pending*)
　jsakalo@bilzin.com
**BILZIN SUMBERG BAENA PRICE & AXELROD LLP**
1450 Brickell Avenue, Suite 2300
Miami, Florida 33131
Telephone: (305) 374-7580
Facsimile:  (305) 374-7593

*/s/ Melissa S. Hayward*
　Melissa S. Hayward
　Texas Bar No. 24044908
　MHayward@HaywardFirm.com
**HAYWARD & ASSOCIATES PLLC**
10501 N. Central Expy., Suite 106
Dallas, Texas 75231
972.755.7100 (phone)
972.755.7110 (facsimile)

**COUNSEL FOR RIALTO REAL ESTATE FUND IV – PROPERTY LP**

## <u>CERTIFICATE OF SERVICE</u>

I, Melissa S. Hayward, hereby certify that on December 16, 2020, a true and correct copy of the foregoing *OBJECTION OF RIALTO REAL ESTATE FUND IV - PROPERTY LP TO REVISED SECOND AMENDED JOINT PLAN OF REORGANIZATION OF TUESDAY MORNING CORPORATION, ET AL. PURSUANT TO CHAPTER 11 OF THE BANKRPUTCY CODE* was filed electronically, and electronic notice will be provided through the Court's Electronic Case Filing System on all parties authorized to received such electronic notice.

/s/ Melissa S. Hayward
Melissa S. Hayward