Ian T. Peck
State Bar No. 24013306
Jarom J. Yates
State Bar No. 24071134
Jordan E. Chavez
State Bar No. 24109883
HAYNES AND BOONE, LLP
2323 Victory Avenue, Suite 700
Dallas, TX 75219
Telephone: 214.651.5000
Facsimile:  214.651.5940
Email: ian.peck@haynesboone.com
Email: jarom.yates@haynesboone.com
Email: jordan.chavez@haynesboone.com

**ATTORNEYS FOR DEBTORS**

# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE NORTHERN DISTRICT OF TEXAS
# DALLAS DIVISION

| | | |
|---|---|---|
| In re: | § | Chapter 11 |
| | § | |
| Tuesday Morning Corporation, *et al.*,[1] | § | Case No. 20-31476-HDH-11 |
| | § | |
| Debtors. | § | Jointly Administered |

**DEBTORS' MOTION FOR ENTRY OF AN ORDER (I) COMPELLING LANDLORDS' COMPLIANCE WITH AMENDED LEASES FOR STORE NOS. 91 AND 399 AND (II) APPROVING DEBTORS' ASSUMPTION OF THE AMENDED LEASES**

**A HEARING HAS BEEN REQUESTED ON THIS MATTER FOR JANUARY 25, 2021 AT 1:30 P.M. (CT) AT THE EARLE CABELL FEDERAL BUILDING, 1100 COMMERCE STREET, 14TH FLOOR, COURTROOM NO. 3, DALLAS, TEXAS 75242.**

**IF YOU OBJECT TO THE RELIEF REQUESTED, YOU MUST RESPOND IN WRITING, SPECIFICALLY ANSWERING EACH PARAGRAPH OF THIS PLEADING. UNLESS OTHERWISE DIRECTED BY THE COURT, YOU MUST FILE YOUR RESPONSE WITH THE CLERK OF THE BANKRUPTCY COURT WITHIN TWENTY-ONE (21) DAYS FROM THE DATE YOU WERE SERVED WITH THIS PLEADING. YOU MUST SERVE A COPY OF YOUR RESPONSE ON THE PERSON WHO SENT YOU THE NOTICE; OTHERWISE, THE COURT**

---

[1] The Debtors in these Chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, include: Tuesday Morning Corporation (8532) ("TM Corp."); TMI Holdings, Inc. (6658) ("TMI Holdings"); Tuesday Morning, Inc. (2994) ("TMI"); Friday Morning, LLC (3440) ("FM LLC"); Days of the Week, Inc. (4231) ("DOTW"); Nights of the Week, Inc. (7141) ("NOTW"); and Tuesday Morning Partners, Ltd. (4232) ("TMP"). The location of the Debtors' service address is 6250 LBJ Freeway, Dallas, TX 75240.

**MAY TREAT THE PLEADING AS UNOPPOSED AND GRANT THE RELIEF REQUESTED.**

Tuesday Morning Corporation and its debtor affiliates, as debtors and debtors-in-possession in the above-referenced chapter 11 cases (collectively, the "Debtors") hereby file this *Debtors' Motion for entry of an order (i) Compelling Landlords' Compliance with Amended Leases for Store Nos. 91 and 399 and (ii) Approving Debtors' Assumption of the Amended Leases* (the "Motion"). In support of the Motion, the Debtors respectfully state as follows:

**Jurisdiction and Venue**

1. The United States District Court for the Northern District of Texas (the "District Court") has jurisdiction over the subject matter of this Motion pursuant to 28 U.S.C. § 1334. The District Court's jurisdiction has been referred to this Court pursuant to 28 U.S.C. § 157 and the District Court's Miscellaneous Order No. 33, *Order of Reference of Bankruptcy Cases and Proceedings Nunc Pro Tunc* dated August 3, 1984. This is a core matter pursuant to 28 U.S.C. § 157(b), which may be heard and finally determined by this Court. Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

**Preliminary Statement**

1. ARC TSKCYMO001, LLC and ARC MCLVSNV001, LLC (collectively, the "Landlords") are the owners and Landlords of two properties leased by the Debtors for Tuesday Morning stores located in Kansas City, Missouri and Las Vegas, Nevada. The Landlords' Agent[2] promised to amend the Debtors' Lease Agreements and subsequently agreed to the Debtors' proposed terms of the Lease Amendments. Although the Debtors circulated the Lease Amendments to the Landlord's Agent reflecting the terms of their agreement, the Landlords failed

---

[2] Capitalized terms used in this Preliminary Statement but not otherwise defined shall have the meanings defined below in the background section of this Motion.

4826-4853-0388 v.4           2

to return executed copies of the Lease Amendments to the Debtors. Months passed before the Debtors were informed that the Landlords were no longer willing to execute the Lease Amendments. Pursuant to applicable Missouri and Nevada contract law, the Lease Amendments constitute valid, enforceable agreements between the Debtors and the Landlords.

2. Pursuant to the agreement between the Debtors and the Landlords' Agent, the Landlords should be compelled to abide by the terms of the Amended Leases. In the alternative, if this Court determines that the terms of the Lease Amendments are not enforceable under contract law, the Court should enforce the Lease Amendments based on estoppel because the Debtors reasonably relied on the Landlords' promises to their detriment.

## Background

3. On May 27, 2020 (the "Petition Date"), the Debtors each filed voluntary petitions for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") commencing the above captioned jointly administered cases (the "Chapter 11 Cases"). The Debtors continue to manage and operate their businesses as debtors-in-possession pursuant to Bankruptcy Code §§ 1107 and 1108.

4. An official committee of unsecured creditors (the "Creditors Committee") was appointed in these Chapter 11 Cases on June 9, 2020. An official equity committee (the "Equity Committee") was appointed in these Chapter 11 Cases on October 5, 2020. No trustee or examiner has been requested or appointed in these Chapter 11 Cases.

5. A detailed description of the Debtors and their business, and the facts and circumstances supporting the Debtors' Chapter 11 Cases are set forth in greater detail in the *Declaration of Barry Folse in Support of the Debtors' Chapter 11 Petitions and First Day Motions* [Docket No. 23] (the "Folse Declaration"), which was filed on the Petition Date.

**A. The Tiffany Springs Lease and Lease Amendment**

6. The Debtors and the Landlord, ARC TSKCYMO001, LLC, are parties to that certain lease agreement dated as of February 20, 2017, for the premises located at Tiffany Springs Market Center, 8986 NW Skyview Ave., Kansas City, MO 64154 (the "Tiffany Springs Lease"). The Tiffany Springs Lease is governed by the laws of Missouri. The Debtors utilize the leased premises as a Tuesday Morning store location (referred to internally as "KANS91"). The Debtors opened for business at the Tiffany Springs location on March 2, 2018. The Tiffany Springs Lease contains several options that the Debtors have not yet exercised. The original Tiffany Springs Lease provided for the payment of monthly base rent during the first five years of $17,218.75 (totaling approximately $206,625 per year plus taxes, insurance, and maintenance charges).

7. Due to the Debtors' financial challenges that ultimately led to the filing of these Chapter 11 Cases, the Debtors were no longer able to pay the rent required by the Tiffany Springs Lease. Prior to the Petition Date, the Debtors engaged A&G Realty Partners, LLC ("A&G") as the Debtors' real estate consultant to render services in connection with the various issues that often arise with landlords during chapter 11 cases involving hundreds of leases. Specifically, A&G negotiated hundreds of amendments with the Debtors' landlords to assist the Debtors with obtaining lease modifications to enable the Debtors to continue operating their business and emerge from chapter 11 as a financially healthier company. This Court approved A&G's formal retention on July 9, 2020. *See Order Granting Application to Employ A&G Realty Partners, LLC as Debtors' Real Estate Consultant and Advisor Effective as of the Petition Date Pursuant to Local Bankruptcy Rule 2014-1(b)(1)* [Docket No. 419].

8. Originally, the Tiffany Springs Lease was on the Debtors' liquidation list for store closure and subsequent rejection; however, the Landlord promised to amend the Lease with the Debtors to reduce the monthly rent and abate certain pre-petition rent. A&G and AR Global (the "Landlord's Agent") negotiated terms for the Lease Amendment over several months, but in July

the negotiations fell flat. On August 13, 2020, the Debtors filed their *Debtors' Notice of Additional Closing Stores (Wave 3)* [Docket No. 598], which listed KANS91 for closure (the store that is the subject of the Tiffany Springs Lease). On August 14, 2020, the Landlord's attorney again expressed the Landlord's desire to continue negotiating, and the parties reached an agreement. The Landlord's Agent confirmed the terms of a lease amendment (the "Tiffany Springs Lease Amendment") in writing via email to A&G on August 28, 2020. The Lease Amendment contains the following terms:

    i.    Expiration: March 31, 2025

    ii.    Abatement of all April 2020 and May 2020 Rent[3]

    iii.    Gross Rent of $175,000 ($14,583.33 per month) (including taxes, insurance, and maintenance charges)

    iv.    Option to renew for an additional period of five (5) years at gross rent of $223,000 for a period of five (5) years ($18,583.33 per month) (including taxes, insurance, and maintenance charges)

    v.    Tenant waives all co-tenancy from March 1, 2020 through July 31, 2022

9. On September 23, 2020, the Debtors filed *Debtors' Notice of Withdrawal of Debtors' Notice of Additional Closing Stores (Wave 3)* [Docket No. 935], because they were able to reach an agreement with most of the listed landlords to amend the leases and continue operating at the respective locations. The Debtors prefer executed formal amendments to leases as a standard business practice. The Debtors' real estate counsel and A&G documented the agreed-upon terms of the Tiffany Springs Lease Amendment in a formal document, but upon circulating same to the Landlord's Agent for execution, they received no responses in return, even after following up multiple times in October and November via telephone and email. The Landlord's attorney responded on November 11, 2020, when she informed Debtors' counsel that the Landlord was no

---

[3] Capitalized terms used to describe the Tiffany Springs Lease Amendment terms but not otherwise defined herein shall have the meanings provided to them in the Lease Amendments.

longer pursuing the Lease Amendments and that the Debtors were aware of same and in agreement with the Landlord's position. The Debtors were neither aware of nor in agreement with the Landlord's purported rejection of the Lease Amendment terms and expressed that fact to the Landlord's attorney the same day, November 11, 2020. The Debtors also explained that the terms had already been accepted by the Landlord, but again they received no response. The Debtors submit that the Tiffany Springs Lease Amendment is valid pursuant to the written communications between the parties, and the Landlord should be ordered to comply with the terms of the Tiffany Springs Lease Amendment rather than demanding compliance with pre-amendment terms.

### B. The Montecito Crossing Lease and Lease Amendment

10. The Debtors and the Landlord, ARC MCLVSNV001, LLC,[4] are parties to that certain lease agreement dated as of January 14, 2010, for the premises located within the Montecito Crossing shopping center at 6660 N. Durango Drive, Las Vegas, Nevada 89149 (the "Montecito Crossing Lease"). The Debtors utilize the leased premises as a Tuesday Morning store location referred to internally as LASV399. The Montecito Crossing Lease is governed by the laws of Nevada. The Montecito Crossing Lease contained an original term of March 1, 2011 – July 31, 2016, with an option for the Debtors to renew for one to five years. On July 31, 2015, the Debtors exercised the renewal option in writing, thereby extending the term of the Montecito Crossing Lease to expire on July 31, 2021. The base rent for the Montecito Crossing Lease was $115,000 per year, $9,583.33 per month at $11.50 per square foot.

11. Similar to the aforementioned events that transpired regarding the Tiffany Springs Lease, the Landlord expressed its intent to enter into an amendment to the Montecito Crossing

---

[4] Landlord is the successor in interest to Inland Western Las Vegas Montecito, L.L.C, the original landlord under the Montecito Crossing Lease.

4826-4853-0388 v.4                                6

Lease with the Debtors (the "Montecito Crossing Lease Amendment" and collectively with the Tiffany Springs Lease Amendment the "Lease Amendments"). A&G and the Landlord's Agent negotiated terms for the Montecito Crossing Lease Amendment over several months, and the Landlord's Agent confirmed the terms of the Montecito Crossing Lease Amendment in writing via email to A&G on July 13, 2020. The Lease Amendment contains the following terms:

    i.    Expiration: July 31, 2023

    ii.    Abatement of all April 2020 and May 2020 Fixed Monthly Rent[5]

    iii.    Base rent of $80,000 ($6,666.67 per month) (excluding taxes, insurance, and maintenance charges)

    iv.    The option to renew for a period of five (5) years at a Fixed Monthly Rent of $115,000 per annum (excluding taxes, insurance, and maintenance charges)

    v.    Tenant waives all co-tenancy from March 1, 2020 through July 31, 2022

12. Upon circulation of the formalized document reflecting the Lease Amendment to the Landlord's Agent, the Debtors received no responses in return, even after following up multiple times in October and November via email and phone. The Landlord's attorney responded on November 11, 2010, when she informed Debtors' counsel that the landlord was no longer pursuing the Montecito Crossing Lease Amendment and that the Debtors were aware of same and in agreement with the Landlord's position. The Debtors were neither aware of nor in agreement with the Landlords' purported rejection of the Montecito Crossing Lease Amendment terms and explained that fact to the Landlord's attorney the same day, November 11, 2020. The Debtors also explained that the terms had already been accepted by the Landlord, but again the Debtors received no response.

---

[5] Capitalized terms used to describe the Montecito Crossing Lease Amendment terms but not otherwise defined herein shall have the meanings provided to them in the Lease Amendments.

Lease with the Debtors (the "Montecito Crossing Lease Amendment" and collectively with the Tiffany Springs Lease Amendment the "Lease Amendments"). A&G and the Landlord's Agent negotiated terms for the Montecito Crossing Lease Amendment over several months, and the Landlord's Agent confirmed the terms of the Montecito Crossing Lease Amendment in writing via email to A&G on July 13, 2020. The Lease Amendment contains the following terms:

    i. Expiration: July 31, 2023

    ii. Abatement of all April 2020 and May 2020 Fixed Monthly Rent[5]

    iii. Base rent of $80,000 ($6,666.67 per month) (excluding taxes, insurance, and maintenance charges)

    iv. The option to renew for a period of five (5) years at a Fixed Monthly Rent of $115,000 per annum (excluding taxes, insurance, and maintenance charges)

    v. Tenant waives all co-tenancy from March 1, 2020 through July 31, 2022

12. Upon circulation of the formalized document reflecting the Lease Amendment to the Landlord's Agent, the Debtors received no responses in return, even after following up multiple times in October and November via email and phone. The Landlord's attorney responded on November 11, 2010, when she informed Debtors' counsel that the landlord was no longer pursuing the Montecito Crossing Lease Amendment and that the Debtors were aware of same and in agreement with the Landlord's position. The Debtors were neither aware of nor in agreement with the Landlords' purported rejection of the Montecito Crossing Lease Amendment terms and explained that fact to the Landlord's attorney the same day, November 11, 2020. The Debtors also explained that the terms had already been accepted by the Landlord, but again the Debtors received no response.

---

[5] Capitalized terms used to describe the Montecito Crossing Lease Amendment terms but not otherwise defined herein shall have the meanings provided to them in the Lease Amendments.

13. The Debtors submit that both Lease Amendments are valid pursuant to the written communications between the parties, and the Landlord should be ordered to comply with the terms of those Lease Amendment rather than demanding compliance with pre-amendment terms. The Debtors' position is further supported by *the Debtors' Notice of (I) Debtors' Request for Authority to Assume and Assign Certain Executory Contracts and Unexpired Leases, and (II) Debtors' Proposed Cure Amounts filed on October 1, 2020* [Docket No. 1107] (the "Original Assumption and Cure Notice"). When the Debtors were still pursuing the sale process, they filed the Original Assumption and Cure Notice and listed the cure amounts for the Tiffany Springs and Montecito Leases as $0 because the Lease Amendments abate prepetition rent.[6]

### Relief Requested

14. The Debtors request the entry of an order, substantially in the form attached to the Motion as **Exhibit A** (the "Order") (i) ordering the Landlords to comply with the Tiffany Springs and Montecito Lease Amendments, (ii) approving the Debtors' assumption of the Tiffany Springs and Montecito Leases as amended, and (iii) granting such further relief as the Court deems appropriate. A copy of the Tiffany Springs Lease with related documents is attached hereto as **Exhibit B**. A copy of the Tiffany Springs Lease Amendment with related documents is attached hereto as **Exhibit C**. A copy of the Montecito Crossing Lease with related documents is attached here to as **Exhibit D**. A copy of the Montecito Crossing Lease Amendment with related documents is attached hereto as **Exhibit E**. The Debtors' Original Assumption and Cure Notice is attached hereto as **Exhibit F**. To the extent the relief requested in this Motion is denied, the Debtors reserve

---

[6] On October 14, 2020, Ballard and Spahr LLP and Reed Smith LLP filed a limited objection to various cure amounts listed in the Debtors' Original Assumption and Cure Notice [Docket No. 1311], including objections to the cure amounts of the Tiffany Springs and Montecito Crossing Leases. Neither Ballard Spahr nor Reed Smith participated in the negotiations of the Lease Amendments. The Debtors negotiated the Lease Amendments with the Landlord's Agent (AR Global) and the Landlord's attorney at Loeb & Loeb, but Loeb & Loeb was not listed on the cure objection.

their right to reject the Tiffany Springs and/or Montecito Crossing Leases pursuant to Bankruptcy Code § 365.

**Basis for Relief Requested**

15. The Debtors respectfully request this Court enter an Order requiring the Landlords to comply with the terms of the Lease Amendments and approving the assumption of the Leases as amended in the Lease Amendments with a $0 cure amount. Pursuant to Bankruptcy Code § 105(a), the Court may issue "any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title." Bankruptcy Code § 105(a) therefore authorizes a bankruptcy court to issue orders or take other necessary steps in aid of its jurisdiction and bankruptcy policies. *See, e.g.*, *United States v. Sutton*, 786 F.2d 1305, 1307 (5th Cir. 1986); *In re Rojas*, 2009 WL 2496807, at *7 (Bankr. S.D. Tex. 2009). Such orders are appropriate where, as here, they are essential to the Debtors' reorganization efforts and do not burden creditors. *See Matter of Jones*, 966 F.2d 169, 173 (5th Cir. 1992) (holding that, as courts of equity, bankruptcy courts are empowered to invoke equitable principles to achieve fairness and justice in the reorganization process). For the reasons set forth below, the relief requested is necessary and proper.

A. **The Landlords Amended the Leases Pursuant to the Landlord Agent's Communications with the Debtors**

16. Missouri and Nevada contract law govern the Leases and the respective Lease Amendments. For a contract or a modification of a prior contract to be enforceable, it must be based on mutual assent and supported by consideration. *Woodson v. Bank of Am., N.A.*, 602 S.W.3d 316, 325 (Mo. Ct. App. 2020); *see also May v. Anderson*, 119 P.3d 1254, 1257 (Nev. 2005) Mutual assent requires a meeting of the minds. *Certified Fire Prot., Inc. v. Precision Constr., Inc.*, 283 P.3d 250, 255 (Nev. 2012) ("A meeting of the minds exists when the parties have agreed upon the contract's essential terms."). Like most states, Nevada and Missouri have codified the statute of frauds. *See* NEV. REV. STAT. ANN. § 111.205; MO. REV. STAT. ANN. § 432.010. Essentially, in both

4826-4853-0388 v.4                    9

states, if a lease is longer than one year in duration, it must be: (i) in writing and (ii) signed by the assenting party (or their agent).

> i. **The Landlord effectively amended the Tiffany Springs Lease pursuant to the communications with the Debtors in writing.**

17. The Tiffany Springs Lease and subsequent Lease Amendment provide for a term of longer than one year, thus invoking the statute of frauds. Missouri law provides that the statute of frauds may be satisfied via electronic communications when parties have agreed to conduct transactions by electronic means. *Crestwood Shops, L.L.C. v. Hilkene*, 197 S.W.3d 641, 650–52 (Mo. Ct. App. 2006). "Whether the parties agree to conduct a transaction by electronic means is determined from the context and surrounding circumstances, including the parties' conduct." *Id.*

18. In *Crestwood Shops*, the Missouri Court of Appeals held that the statute of frauds was satisfied by the transmission of email correspondence between a landlord and tenant based on the surrounding circumstances. *See id.* The parties primarily communicated through email, thus, the tenant's termination of the lease by email to the landlord was a valid writing. *Id.* The landlord accepted the offer to terminate by sending the tenant a lease termination letter. *Id.* The court enforced the termination and rejected the tenant's argument that she was not offering to terminate the lease, but rather she was attempting to continue negotiations of the terms. *Id.* at 653. The court further rejected the tenant's argument that an executed agreement was necessary based on the landlord previously requiring a formally executed amendment for the lease with the tenant and requiring a written termination agreement with the prior tenant of the premises. *Id.* The court concluded that the landlord could reasonably believe that the email constituted an offer to terminate, which it subsequently accepted. *Id.* at 654–55.

19. Like the parties in the *Crestwood Shops* case, the Debtors and their professionals and the Landlord and its professionals have primarily communicated via email while negotiating and finalizing the Tiffany Springs Lease Amendment. The Landlord's Agent accepted the terms

of the Tiffany Springs Lease Amendment via email to A&G on August 28, 2020. As such, the Lease Amendment satisfies the statute of frauds as a writing signed on behalf of the Landlord by the Landlord's Agent[7] and is binding on the parties.

      **ii.**    **The Landlord effectively amended the Montecito Lease pursuant to the communications with the Debtors in writing.**

    20.    Under Nevada law, a contract is formed when the parties have agreed to the material terms, even if the contract's exact language is not finalized. *See Higbee v. Sentry Ins. Co.*, 253 F.3d 994, 998 (7th Cir. 2001). A party's subjective belief that it would not be bound by an agreement does "not preclude a finding that a contract has been formed." *Higbee v. Sentry, Ins. Co.*, 253 F.3d at 997 (citing *Wilson v. Wilson*, 46 F.3d 660, 666—67 (7th Cir. 1995); *Abbott Lab v. Alpha Therapeutic Corp.*, 164 F.3d 385, 387 (7th Cir. 1999)).

    21.    Similar to Missouri law, Nevada law provides that the statute of frauds may be satisfied via electronic communications because Nevada has codified the Uniform Electronic Transactions Act. NEV. REV. STAT. ANN. §§ 719.100–719.360. Additionally, separate writings may be considered together to satisfy statute of frauds, even though one of them was not signed by the party charged and neither was sufficient itself. *See Edwards Indus., Inc. v. DTE/BTE Inc.*, 923 P.2d 569 (Nev. 1996).

    22.    The Nevada Supreme Court has also enforced agreements that were reduced to writing but never executed. *See Grisham v. Grisham*, 289 P.3d 230, 235–37. In *Grisham*, the parties agreed to the terms of a settlement agreement, reduced it to a draft writing, and one of the parties refused to sign it. *See id.* The Nevada Supreme Court affirmed the family court's

---

[7] Even assuming *arguendo* that the Landlord's Agent did not have express authority to enter into the Lease Amendment, the Landlord's Agent had apparent authority on which the Debtors could reasonably rely. Apparent authority is established when a principal, either by its acts or representations, leads third parties to believe that authority has been given to an agent. *See generally United Mo. Bank, N.A. v. Beard*, 877 S.W.2d 237, 239–40 (Mo. Ct. App. W.D. 1994) (explaining the legal concept of apparent authority).

enforcement of the agreement. *See id.* The Court explained "the writing, in order to have a memorandum to satisfy the Statute of Frauds need not be contained in any one paper, but may include unsigned writings . . . united by content or reference, and even, in a proper framework, united by parol evidence.'" *Id.* (citing 10 Richard A. Lord, Williston on Contracts § 29:29 (West 2012) (quoting *Papaioannou v. Britz*, 285 A.D. 596, 139 N.Y.S.2d 658, 662 (App. Div. 1955))).

23. Here, the Debtors and the Landlord's Agent agreed on the terms of the Montecito Lease Amendment via electronic communications. Even assuming the Landlord did not subjectively believe it was bound by the terms of the Lease Amendment since it was not in final, executed form, such a belief is insufficient to determine the agreement was not formed. As such, the Lease Amendment satisfies the statute of frauds and is binding on the parties.[8]

**B. The Debtors' Relied to their Detriment on the Statements and Promises of the Landlords and Continue to Suffer Harm Due to the Landlords' Noncompliance**

24. If this Court determines that the Landlords and Debtors do not have enforceable contracts for the Lease Amendments, then the Debtors alternatively submit that estoppel applies because the Debtors relied on the Landlords' representations to their detriment. The elements of estoppel are essentially the same in Nevada and Missouri: (i) the promisor (the Landlords) expected the promissee (the Debtors) to rely on the promise; (ii) the promissee acted reasonably in reliance; and (iii) the refusal to enforce the promise would result in fraud/injustice/detrimental reliance. *Moore v. Missouri-Nebraska Exp., Inc.*, 892 S.W.2d 696, 703 (Mo. Ct. App. W.D. 1994); *Cheqer, Inc. v. Painters & Decorators Joint Comm., Inc.*, 655 P.2d 996, 998–99 (Nev. 1982); *Zunino v. Paramore*, 435 P.2d 196, 197 (Nev. 1967). Estoppel applies when the reliant party is influenced by the acts or silence of the other party and it appears that the acts or conduct of the

---

[8] Even assuming *arguendo* that the Landlord's Agent did not have express authority to enter into the Lease Amendment, the Landlord's Agent had apparent authority on which the Debtors could reasonably rely. *See generally Ellis v. Nelson*, 233 P.2d 1072 (Nev. 1951) (explaining the legal concept of apparent authority).

estopped party "caused the party relying to act as [it] would not have acted." *Zunino*, 435 F.2d at 197.

25. Missouri courts have equated an offer to make a contract as a "promise" defined as "an expression of intention that the promisor will conduct himself in a specified way or bring about a specified result in the future, communication in such a manner to a promisee that he may justly expect performance, and may reasonably rely thereon." *Moore*, 892 S.W. 2d at 703–04 (internal citations omitted). An offer to enter into a lease amendment qualifies as a promise and the terms of an unexecuted amendment may be enforced when there is reasonable reliance thereon. See *Moore,* 892 S.W. 2d at 703–04 (affirming the judgment for the amount of termination fees contemplated under proposed lease amendments that had never been formally adopted); *see also Merrill v. DeMott*, 951 P.2d 1040, 1043–44 (Nev. 1997) (holding estoppel precluded the tenant from asserting that the lease was invalid when the landlord relied on the negotiations and validity of the lease to its detriment).

26. Here, if the Court disagrees that the Lease Amendments are valid based on the parties' electronic correspondence, the Court should still enforce the terms of the Lease Amendments based on estoppel. The elements of estoppel are satisfied in that the Landlords made a promise to the Debtors to enter into amendments of the Tiffany Springs and Montecito Lease Amendments. The Debtors reasonably relied on the promise and subsequent negotiations by refraining from conducting going-out-of-business sales at the respective stores, refraining from exercising their right to reject the Tiffany Springs and Montecito Crossing Leases, and continuing to satisfy post-petition obligations throughout the Chapter 11 Cases. As such, injustice may only be avoided by enforcement of the terms of the Lease Amendments and approval of the Debtors' assumption of the Leases as amended.

**Notice**

27. Notice of this Motion will be provided to: (i) counsel for the Landlords, (ii) the Office of the United States Trustee; (iii) those persons who have formally appeared and requested notice and service in these proceedings pursuant to Bankruptcy Rules 2002 and 3017; and (iv) counsel for the DIP ABL Agent and DIP Term Agent[9], (v) the Creditors' Committee and the Equity Committee, and (vi) the list of the 20 largest unsecured creditors of each of the Debtors (collectively, the "Notice Parties"). Based on the urgency of the circumstances surrounding this Motion and the nature of the relief requested herein, the Debtors respectfully submit that no further notice is required.

## Conclusion

WHEREFORE, based on the foregoing, the Debtors respectfully request that the Court (i) grant the Motion, and (ii) grant such other and further relief as is just and proper.

RESPECTFULLY SUBMITTED this 31st day of December, 2020.

**HAYNES AND BOONE, LLP**

By: /s/ Ian T. Peck
Ian T. Peck
State Bar No. 24013306
Jarom J. Yates
State Bar No. 24071134
Jordan E. Chavez
State Bar No. 24109883
**HAYNES AND BOONE, LLP**
2323 Victory Avenue, Suite 700
Dallas, TX 75219
Telephone: 214.651.5000
Facsimile: 214.651.5940
Email: ian.peck@haynesboone.com
Email: jarom.yates@haynesboone.com
Email: jordan.chavez@haynesboone.com

---

[9] "DIP Term Agent" means Franchise Group, Inc., in its capacities as administrative agent and collateral agent under the DIP Real Estate Facility Credit Agreement dated as of July 10, 2020.

**ATTORNEYS FOR DEBTORS**